## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NIKE, INC.

      Plaintiff,

          v.

PUMA NORTH AMERICA, INC.

      Defendant.

C. A. No. 1:18-cv-10876 LTS

**DEMAND FOR JURY TRIAL**

**LEAVE TO FILE GRANTED
ON FEBRUARY 19, 2019**

### SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

NIKE's mission is to "bring inspiration and innovation to every athlete* in the world." NIKE fulfills that mission by investing heavily in research, design, and development; creating game-changing technologies and products that enhance athletic performance, reduce injury, and maximize comfort while reducing waste.

Puma, in contrast, has forgone independent innovation and is instead using NIKE's technologies without permission. Puma is using NIKE's Flyknit, Air, cleat assembly, Fuse, and cushioning technologies. NIKE has asked Puma to stop. Puma refuses to do so.

NIKE therefore brings this patent lawsuit to defend its investments in innovation and to protect its technologies. NIKE alleges, with knowledge as to its own acts and on information and belief as to other matters, as follows:

### THE PARTIES

1.      NIKE, Inc. ("NIKE") is a corporation organized under the laws of the State of

---

\* The legendary University of Oregon track and field coach, and NIKE co-founder, Bill Bowerman said, "If you have a body, you are an athlete."

1

Oregon and has a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.

2.      Puma North America, Inc. ("Puma") is a corporation organized under the laws of the State of Delaware and has a principal place of business at 10 Lyberty Way, Westford, Massachusetts 01886.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 *et seq*.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over Puma because Puma maintains its headquarters and principal place of business in Massachusetts.  This Court also has personal jurisdiction over Puma because, on information and belief, Puma regularly solicits and conducts business in Massachusetts and engages in other persistent courses of conduct in Massachusetts. This Court also has personal jurisdiction over Puma because, on information and belief, Puma derives substantial revenue from goods and services sold to persons or entities in Massachusetts and commits acts of infringement in Massachusetts, including but not limited to making, using, offering to sell, selling, and/or importing products that infringe one or more claims of NIKE's patents at issue in this case.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400 at least because Puma maintains a regular and established place of business in Massachusetts and has committed, and continues to commit, acts of infringement in Massachusetts, including but not limited to making, using, offering to sell, selling, and/or importing products that infringe one or more claims of NIKE's patents at issue in this case.

## FACTUAL BACKGROUND

6.     NIKE's principal business activity is the design, development and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

7.     NIKE is the largest seller of athletic footwear and apparel in the world.

8.     NIKE invests heavily in research, design, and development; and those efforts are key to NIKE's success.

9.     NIKE's investment in and dedication to innovation has led to many revolutionary footwear technologies, including Flyknit, NIKE Air, innovative soccer cleat assemblies, Fuse, cushioning, and others.

10.     NIKE uses its revolutionary technologies throughout its product categories.

### NIKE's Flyknit Technology

11.     NIKE's Flyknit technology relates to footwear uppers.

12.     Articles of footwear typically include two primary elements: an upper and a sole structure.  The upper is the portion that covers the foot.  The sole structure is the portion below the upper between the foot and the ground.

13.     In the past, footwear manufacturers typically made uppers by piecing together multiple different materials to impart different properties to different areas of the upper.  For example, a manufacturer may use leather materials in the toe and heel areas of the upper to impart a relatively high degree of wear-resistance, and a manufacturer may use synthetic or natural textile materials in other areas of the upper to impart flexibility and air-permeability.

14.     The conventional way of making uppers had certain inefficiencies.  It often required sourcing materials from multiple suppliers, operating multiple machines, and coordinating multiple assembly line techniques, manufacturing steps, and individuals.

3

15.     NIKE recognized those inefficiencies and committed significant time and resources to innovating solutions.

16.     Through years of research, design, and development, NIKE invented novel and non-obvious ways to form uppers from a single knitted material while still providing different textures or properties to different areas of the uppers.  This technology became Flyknit.

17.     Flyknit combines high strength fiber technology with advanced manufacturing techniques, allowing designers to precisely micro-engineer every stitch of a footwear upper.  The result is a featherweight, form-fitting, and virtually seamless sock-like upper, scientifically tuned to provide areas of support, flexibility, and breathability where athletes need them most.  The illustration below shows a Flyknit upper detached from a sole structure.

**Example Flyknit Upper**



18.     NIKE introduced its first Flyknit footwear in early 2012.  NIKE called that footwear the Flyknit Racer and the Flyknit Trainer+.  The illustrations below show examples of a Flyknit Racer and a Flyknit Trainer+.

| Flyknit Racer | Flyknit Trainer+ |
|:---:|:---:|
|  | |

19.     The industry praised and celebrated NIKE's Flyknit technology.

20.     Industry commentators lauded how "NIKE Flyknit revolutionized the age-old craft of shoemaking," and they characterized Flyknit as a "quantum leap" in the industry.  (Exs. H, I.)

21.     Athletes immediately began taking advantage of Flyknit technology.  For example, marathon runner Abel Kirui wore Flyknit footwear during his silver medal-winning performance at the 2012 London Olympics.

22.     Since then, Flyknit has proven to be one of NIKE's most successful technologies among professional athletes and casual consumers alike.

23.     Flyknit is a platform technology that NIKE incorporates throughout its product categories, such as Running, NIKE Basketball, the Jordan Brand, Soccer, Men's Training, Women's Training, Tennis, and Sportswear.  The illustrations below show examples of the proliferation of Flyknit throughout NIKE's product categories.

| LunarEpic Low Flyknit | Flyknit Free RN |
|---|---|



| Kobe Elite 11 | Air Jordan Retro 1 Flyknit |
|---|---|



| Magista | Metcon DSX Flyknit |
|---|---|



| Women's Free TR Flyknit 2 | NIKE Flyknit Roshe Two |
|---|---|



24.     Flyknit technology is an important component of NIKE's strategy and it is integral to NIKE's success.

25.     NIKE has taken steps to protect its Flyknit technology, including by filing and obtaining patents around the world.

26.     NIKE owns more than 300 issued utility patents directed to its Flyknit technology.

27.     Relevant to this dispute, NIKE owns all right, title, and interest in and to the following U.S. patents directed to certain aspects of Flyknit technology: 7,637,032 (the "'032 patent"), 8,266,749 (the "'749 patent"), 9,078,488 (the "'488 patent"), 9,375,046 (the "'046 patent"), and 10,070,679 (the "'679 patent") (collectively, the "Flyknit Patents").

28.     The U.S. Patent Office duly and legally issued the '032 patent on December 29, 2009.  A true and correct copy of the '032 patent is attached as Complaint Exhibit A.

29.     The U.S. Patent Office duly and legally issued the '749 patent on September 18, 2012.  A true and correct copy of the '749 patent is attached as Complaint Exhibit B.

30.     The U.S. Patent Office duly and legally issued the '488 patent on July 14, 2015.  A true and correct copy of the '488 patent is attached as Complaint Exhibit C.

31.     The U.S. Patent Office duly and legally issued the '046 patent on July 28, 2016.  A true and correct copy of the '046 patent is attached as Complaint Exhibit D.

32.     The U.S. Patent Office duly and legally issued the '679 patent on September 11, 2018.  A true and correct copy of the '679 patent is attached as Complaint Exhibit X.

**Puma Uses Flyknit Technology without NIKE's Permission**

33.     Over three years after NIKE introduced Flyknit, Puma began using the Flyknit technology without NIKE's permission.

34.     Puma introduced its first knitted footwear, the IGNITE Proknit, in October 2015.

7

(Ex. J.)

35.     Puma has promoted the IGNITE Proknit as having a "fully knit upper" that "gives it lightweight breathability, an incredibly comfortable fit, and fresh style."  The illustration below shows an example IGNITE Proknit.

**IGNITE Proknit**



36.     Industry commentators noted the IGNITE Proknit was Puma's attempt to join the "the knit sneaker craze" that NIKE created with Flyknit.  (Ex. K.)

37.     Puma has since released additional knitted footwear products, including at least the IGNITE Speed Netfit, the Mostro Bubble Knit, the Jamming, the TSUGI evoKnit Sock, the TSUGI Jun CLRSHFT, the TSUGI Jun Cubism, the TSUGI Shinsei evoKnit, and the Ferrari Evo Cat.  The illustrations below show examples of the IGNITE Speed Netfit, the Mostro Bubble Knit, and the Jamming.

**IGNITE Speed Netfit**



**Mostro Bubble Knit**



**The Jamming**



38.     Puma's IGNITE Proknit, IGNITE Speed Netfit, Mostro Bubble Knit, Jamming,

TSUGI evoKnit Sock, TSUGI Jun CLRSHFT, TSUGI Jun Cubism, TSUGI Shinsei evoKnit,

Ferrari Evo Cat, Blaze Cage evoKNIT, Avid evoKNIT, Limitless Hi evoKNIT, and potentially

other Puma knitted footwear, use NIKE's Flyknit technology and practice the inventions covered by one or more claims of NIKE's Flyknit Patents.

39.     Puma's IGNITE Proknit, TSUGI evoKnit Sock, TSUGI Jun CLRSHFT, and TSUGI Jun Cubism practice the invention claimed in NIKE's '032 patent.  For example, as can be seen in the illustration above, the IGNITE Proknit is an article of footwear with an upper substantially constructed from textile material, wherein the upper includes an exterior portion substantially constructed from knitted textile material.  The exterior portion includes a first region having stability ribs integrally formed in the knitted textile material and a second region continuous with the first region, the second region not including stability ribs.  A first portion of the first region extends along a forefoot portion of the upper and a second portion of the first region extends along a lateral midfoot side of the upper.  A portion of the second region extends along a junction between the upper and the sole and between the first portion of the first region and the second portion of the first region.  The IGNITE Proknit also has a sole engaged with the upper.

40.     Puma's IGNITE Proknit, IGNITE Speed Netfit, Mostro Bubble Knit, Jamming, TSUGI evoKnit Sock, TSUGI Jun CLRSHFT, TSUGI Jun Cubism, TSUGI Shinsei evoKnit, Ferrari Evo Cat, Blaze Cage evoKNIT, Avid evoKNIT, Limitless Hi evoKNIT, and potentially other Puma knitted footwear, practice the invention claimed in NIKE's '749 patent.  For example, on information and belief, and as can be seen in the illustrations above, Puma manufactures its knitted footwear by simultaneously knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure; removing the knitted textile element from the surrounding knitted textile structure; and incorporating the knitted textile element into the article of footwear.

10

41.     Puma's IGNITE Speed Netfit, TSUGI Shinsei evoKnit, and Ferrari Evo Cat practice the invention claimed in NIKE's '488 patent.  For example, as can be seen in the illustration above, the IGNITE Speed Netfit is an article of footwear including an upper and a sole structure attached to the upper, the upper incorporating a knitted component formed of unitary knit construction, the knitted component comprising: at least one lenticular knit structure including a first portion and a second portion disposed on opposite sides of the lenticular knit structure; and a base portion disposed adjacent to the at least one lenticular knit structure; wherein the at least one lenticular knit structure extends away from the base portion on an exterior surface of the upper; and wherein the first portion of the at least one lenticular knit structure is associated with a first visual effect when the upper is viewed from a first viewing angle and the second portion of the at least one lenticular knit structure is associated with a second visual effect when the upper is viewed from a second viewing angle that is different than the first viewing angle.

42.     Puma's IGNITE Speed Netfit practices the invention claimed in NIKE's '046 patent.  For example, as can be seen in the illustration above, the IGNITE Speed Netfit is an article comprising: a plurality of webbed areas having a front surface, the webbed areas configured to move between a neutral position and an extended position, the webbed areas being biased to move toward the neutral position, and a plurality of tubular structures that are adjacent to the webbed areas, the tubular structures; wherein at least one of the webbed areas or tubular structures is configured to stretch to move the webbed areas to the extended position in response to a force applied to the article; wherein in the neutral position, a first area of the front surface is hidden from visual observation from a first viewing perspective, and wherein in the extended position, the first area of the front surface is revealed for visual observation from the first viewing perspective.

43.     Puma's IGNITE Speed Netfit, TSUGI Shinsei evoKnit, and Ferrari Evo Cat practice the invention claimed in NIKE's '679 patent.  For example, as can be seen in the illustration above, the IGNITE Speed Netfit includes a lenticular knit structure for providing color-shifting properties to a knitted component, the lenticular knit structure comprising: a portion disposed on a first side of the lenticular knit structure; a second portion disposed on a second side of the lenticular knit structure, the second side being disposed opposite the first side; and wherein the first portion of the lenticular knit structure is associated with a first visual effect when the lenticular knit structure is viewed form a first viewing angle and the second portion of the lenticular knit structure is associated with a second visual effect when the lenticular knit structure is viewed from a second viewing angle that is different from the first viewing angle; wherein the knitted component includes a front side and an opposite-facing back side; and wherein the lenticular knit structure is disposed on the front side of the knitted component.

44.     Pursuant to 35 U.S.C. § 287, NIKE notified Puma on multiple occasions that it infringes NIKE's Flyknit Patents by making, using, selling, offering to sell, and/or importing certain of its knitted footwear into the United States.  (Exs. L–O, AA.)

45.     NIKE asked Puma to stop infringing its Flyknit Patents.  (*Id*.)

46.     Puma continues to infringe NIKE's Flyknit Patents by making, using, selling, offering to sell, and/or importing infringing knitted footwear into this District and elsewhere in the United States without the consent or authorization of NIKE.

47.     On information and belief, Puma promotes and sells its infringing footwear at retail stores throughout the United States, including at retail stores located in Massachusetts.  (Ex. P.)

48.     On information and belief, Puma also promotes and sells its infringing footwear nationwide, including in Massachusetts, through its website at http://us.puma.com.  (Ex. Q.)

12

## NIKE Air Technology

49.     NIKE Air technology relates to footwear sole structures.

50.     NIKE Air generally relates to "Air Sole" units: tough, yet flexible bags filled with gas or fluid, located in the sole structure of footwear.

51.     NIKE launched footwear containing its NIKE Air technology in 1987.

52.     NIKE called its first NIKE Air shoe the Air Max 1.  The Air Max 1 featured an Air Sole unit placed in the rear midsole.  The illustration below shows an Air Max 1 and its Air Sole.



**Air Max 1 and its Air Sole**

53.     NIKE continued to innovate its NIKE Air technology over the following three decades: increasing bladder size, adding bladders to the forefoot, improving flexibility, and experimenting with various gases and fluids to fill the bladders.  The illustrations below show the evolution of NIKE Air technology over the years.

13



54.    NIKE Air technology provides many benefits.  For example, NIKE Air reduces the weight of the footwear, without reducing performance, by replacing conventional foam with air-filled bags.  Lighter footwear converses the athlete's energy during performance.

55.    NIKE Air also provides cushioning benefits.  As the foot strikes the ground, NIKE Air absorbs impact forces that would otherwise be exerted on the athlete's muscles, joints and tendons, protecting the body against fatigue and stress.  After impact, NIKE Air units return to their original shape, ready for the next impact force.

56.    Like Flyknit, NIKE Air is a platform technology that NIKE incorporates throughout its product categories, such as Running, NIKE Basketball, the Jordan Brand, Soccer, Men's Training, Women's Training, and Sportswear.

57.    NIKE Air is an important component of NIKE's strategy and it is integral to NIKE's success.

14

58.     NIKE has taken steps to protect its NIKE Air technology, including by filing and obtaining patents around the world.

59.     NIKE owns more than 800 utility patents directed to its NIKE Air technology.

60.     Relevant to this dispute, NIKE owns all right, title, and interest in and to U.S. Patent No. 7,401,420 (the "'420 patent") directed to certain aspects of NIKE Air technology.

61.     The U.S. Patent Office duly and legally issued the '420 patent on July 22, 2008.  A true and correct copy of the '420 patent is attached as Complaint Exhibit E.

### Puma Uses NIKE Air Technology without NIKE's Permission

62.     Thirty years after NIKE Air revolutionized the footwear industry, Puma began using NIKE Air technology without NIKE's permission.

63.     Puma introduced its first footwear with a fluid-filled bladder, the Jamming, in November 2017.  (Ex. R.)

64.     Puma has promoted the features of the Jamming as including: "evoKNIT upper provides form-fitting comfort," "free-floating NRGY beads made from high cushioning PU foam adjust to your foot as you run for adaptive support," and "translucent TPU encases the multi-coloured NRGY beads, providing a visually stunning outsole design."  (Ex. S.)  The illustration below shows an example IGNITE Proknit and its fluid-filled bladder.

| The Jamming |
| --- |



15

65.     Puma's Jamming uses NIKE Air technology and practices the invention claimed in NIKE's '420 patent.  For example, the Jamming is an article of footwear comprising: a sole structure incorporating a fluid-filled bladder and a reinforcing structure secured to the bladder, the sole structure having an upper surface and an opposite lower surface, the upper surface forming a ridge that defines a first portion of a lasting surface, at least a portion of the ridge being an inclined surface formed by the reinforcing structure and located over the bladder, the bladder defining a second portion of the lasting surface; and an upper secured directly to the first portion of the lasting surface and the second portion of the lasting surface.

66.     Puma infringes NIKE's '420 patent by making, using, selling, offering to sell, and/or importing its infringing Jamming footwear in this District and elsewhere in the United States without the consent or authorization of NIKE.

67.     Pursuant to 35 U.S.C. § 287, NIKE notified Puma that it infringes NIKE's '420 patent by making, using, selling, offering to sell, and/or importing at least its Jamming footwear into the United States.  (Ex. O.)

68.     NIKE asked Puma to stop infringing its '420 patent.  (*Id.*)

69.     Puma continues to infringe NIKE's '420 patent by making, using, selling, offering to sell, and/or importing its Jamming footwear into this District and elsewhere in the United States without the consent or authorization of NIKE.

70.     On information and belief, Puma promotes and sells its infringing Jamming footwear at retail stores throughout the United States, including at retail stores located in Massachusetts.  (Ex. P.)

71.     On information and belief, Puma also promotes and sells its infringing Jamming footwear nationwide, including in Massachusetts, through its website at http://us.puma.com.  (Ex. Q.)

**NIKE Soccer Cleat Assembly Technology**

72.     NIKE introduced its first soccer cleat in 1971: a black-and-white molded rubber cleat called "The Nike."  The illustration below shows an example of "The Nike."



73.     Over the next 47 years, NIKE leveraged research, testing, and insight from the world's best players—including Mia Hamm, Ronaldinho, Ronaldo, and Neymar—to redefine cleated footwear.  The illustrations below show examples of NIKE cleated footwear today.



74.     NIKE's cleat assemblies combine, among other things, strategically placed cleats, support bars, and sections of varying stiffness to improve flexibility, foot control, balance, and propulsion; while also increasing comfort and reducing fatigue.

75.     NIKE's cleat assemblies are an important component of NIKE's strategy and they are integral to NIKE's success.

76.     NIKE has taken steps to protect its cleat assembly technologies, including by filing and obtaining patents around the world.

77.     NIKE owns more than 200 utility patents directed to its cleat assembly technologies.

78.     Relevant to this dispute, NIKE owns all right, title, and interest in and to U.S. Patent Nos. 6,973,746 (the "'746 patent") and 9,314,065 (the "'065 patent") directed to certain aspects of NIKE cleat assembly technology.

79.     The U.S. Patent Office duly and legally issued the '746 patent on December 13, 2005.  A true and correct copy of the '746 patent is attached as Complaint Exhibit F.

80.     The U.S. Patent Office duly and legally issued the '065 patent on April 19, 2016. A true and correct copy of the '065 patent is attached as Complaint Exhibit G.

**Puma Uses NIKE Cleat Assembly Technologies without NIKE's Permission**

81.     Puma introduced its evoSPEED SL FG in 2015.  (Ex. T.)  Puma introduced its evoSPEED SL II in 2016.  (Ex. U.)   The illustrations below show examples of the evoSPEED SL footwear.

| evoSPEED SL FG | evoSPEED SL II |
|---|---|



82.     Puma introduced its ONE 18.1 Syn FG footwear in 2018.  (Ex. V.)  The illustration below shows an example of the ONE 18.1 Syn FG footwear.

| ONE 18.1 Syn FG |
|---|



83.     Puma introduced its FUTURE Netfit FG/AG footwear in 2018, including its FUTURE 18.1, FUTURE 18.2, FUTURE 18.3, and FUTURE 18.4 (collectively, the FUTURE Netfit FG/AG footwear").  (Ex. W.)  The illustration below shows an example of the FUTURE Netfit FG/AG.

**FUTURE Netfit FG/AG**



84. Puma's evoSPEED SL footwear and ONE 18.1 Syn FG footwear practice the invention claimed in NIKE's '746 patent. For example, the evoSPEED SL and ONE 18.1 Syn FG are each an article of footwear with an upper and a cleat assembly coupled to the upper. The cleat assembly includes a base having medial and lateral sides, a plurality of downwardly extending ground engaging members, a medial support bar located on the medial side, a lateral support bar located on the lateral side, a lateral stiffened section located in a region of the cleat assembly generally corresponding to a midfoot portion of the lateral support bar, and a medial stiffened section located in a region of the cleat assembly generally corresponding to a midfoot portion of the medial support bar, the medial stiffened section being stiffer than the lateral stiffened section.

85. Puma's FUTURE Netfit FG/AG footwear practices the invention claimed in NIKE's '065 patent. Figure 5 of the '065 patent and an image of a FUTURE Netfit FG/AG footwear are reproduced below. As can be seen, the FUTURE Netfit FG/AG footwear is an article of footwear comprising: a base plate including a forefoot region, a heel region, a midfoot portion disposed between the forefoot region and the heel region, a longitudinal axis extending through the forefoot region and heel region, a forward edge, a rearward edge, a medial edge, and a lateral

edge; a structure disposed on the base plate, the structure including a medial forefoot pad disposed on the forefoot region proximate the midfoot portion and the medial edge, a lateral forefoot pad disposed on the forefoot region proximate the midfoot portion and the lateral edge, a medial heel pad disposed on the heel region proximate the medial edge, a first lateral heel pad disposed on the heel region proximate the lateral edge, a first diagonal rib extending from the medial forefoot pad to the first lateral heel pad, a second diagonal rib extending from the lateral forefoot pad to the medial heel pad, a medial midfoot bar substantially parallel to the longitudinal axis and disposed proximate the medial edge, and a lateral midfoot bar substantially parallel to the longitudinal axis and disposed proximate the lateral edge; a medial forefoot stud disposed on the medial forefoot pad; a medial heel stud disposed on the medial heel pad; a first lateral forefoot stud disposed on the lateral forefoot pad; and a first lateral heel stud disposed on the first lateral heel pad; the first diagonal rib having a first lateral edge intersecting with the first lateral heel pad; the second diagonal rib having a second lateral edge intersecting with the first lateral forefoot pad; the lateral midfoot bar having a third lateral edge; wherein the medial midfoot bar extends from a first point on the first diagonal rib to a second point on the second diagonal rib; and wherein the third lateral edge of the lateral midfoot bar intersects with, and terminates at, a third point on the second diagonal rib at a forward end of the lateral midfoot bar; wherein the third lateral edge of the lateral midfoot bar intersects with, and terminates at, a fourth point on the first diagonal rib at a rearward end of the lateral midfoot bar; wherein the third point is spaced from the lateral forefoot pad; and wherein the fourth point is spaced from the first lateral heel pad.



**Figure 5 of the '065 patent**

FIG.5



**FUTURE Netfit FG/AG**

86.     Pursuant to 35 U.S.C. § 287, NIKE notified Puma on multiple occasions that it infringes NIKE's '746 patent and '065 patent by making, using, selling, offering to sell, and/or importing at least its evoSPEED SL footwear and FUTURE Netfit FG/AG footwear into the United States.  (Exs. L-O.)

87.     NIKE asked Puma to stop infringing its '746 patent and '065 patent.  (*Id.*)

88.     Puma not only continued to infringe NIKE's '746 patent and '065 patent by making, using, selling, offering to sell, and/or importing its evoSPEED SL footwear and FUTURE

Netfit FG/AG footwear into this District and elsewhere in the United States without the consent or authorization of NIKE, but Puma also began making, using, selling, offering to sell, and/or importing its infringing ONE 18.1 Syn FG footwear into this District and elsewhere in the United States without the consent or authorization of NIKE.

89.     On information and belief, Puma promotes and sells its evoSPEED SL footwear, ONE 18.1 Syn FG footwear, and FUTURE Netfit FG/AG footwear at retail stores throughout the United States, including at retail stores located in Massachusetts.  (Ex. P.)

90.     On information and belief, Puma also promotes and sells its evoSPEED SL footwear, ONE 18.1 Syn FG footwear, and FUTURE Netfit FG/AG footwear nationwide, including in Massachusetts, through its website at http://us.puma.com.  (Ex. Q.)

## NIKE Fuse Technology

91.     One of NIKE's more recent footwear innovations is its Fuse technology.

92.     The Fuse technology relates to footwear uppers that include bonded mesh composite panels.  The composite panels include a substrate material panel, a mesh material panel, and a skin material panel.

93.     NIKE launched its footwear containing its Fuse technology in 2013.  (Ex. Y.)

94.     NIKE incorporates its Fuse technology into many of its shoe products, including its NIKE Air shoes.



**NIKE Air Shoe with Fuse Technology**

95.     NIKE Fuse technology provides various benefits.   The benefits improve over previous methods of footwear construction that emphasized providing support to the foot of a wearer at the cost of increased buildup of heat and perspiration around the foot due to blockage of air flow and moisture flow.   To address these drawbacks, Fuse technology includes a substrate material layer that provides one or more openings for ventilation, which improves air flow to help cool and dry the foot of a wearer while also contributing to weight reduction of the shoe.   The addition of the mesh material layer further reduces weight by retaining individual portions of the substrate material in a desired arrangement and permitting larger ventilation holes.   Together, the combined strength of the mesh and substrate materials obviate the need for another material on the outside surface of the upper, allowing for lighter construction of the footwear.

96.     NIKE Fuse is an important component of NIKE's strategy and it is integral to NIKE's success.

97.     NIKE has taken steps to protect its NIKE Fuse technology, including by filing and obtaining patents around the world.

98.     Relevant to this dispute, NIKE owns all right, title, and interest in and to U.S. Patent No. 10,051,917 (the "'917 patent) directed to certain aspects of NIKE Fuse technology.

99.     The U.S. Patent Office duly and legally issued the '917 patent on August 21, 2018. A true and correct copy of the '917 patent is attached as Complaint Exhibit Z.

**Puma Uses NIKE Fuse Technology without NIKE's Permission**

100.     As detailed above, Puma introduced its Netfit footwear at least by 2015.  In addition to the example Netfit footwear shown above, the illustrations below shows an example of the FUTURE 2.3 Netfit footwear.



**FUTURE 2.3 Netfit**

101.     Puma's Netfit footwear practice the invention claimed in NIKE's '917 patent.  For example, as can be seen in the illustration above, Puma's Netfit footwear include an upper comprising a plurality of panels assembled as a composite panel, wherein the composite panel includes a substrate material panel; a mesh material panel, and a skin material panel with at least a portion of the skin material panel overlapping both the substrate material panel and the mesh material panel in a skin/mesh/substrate overlap area; wherein the skin material panel is bonded with the mesh material panel and the substrate material panel throughout the skin/mesh/substrate overlap area, the mesh material panel being captured between the skin material panel and the substrate material panel; wherein at a portion of the composite panel outside the skin/mesh/substrate overlap area, the mesh material panel is not captured between the skin material

panel and the substrate material panel; and wherein the skin material panel conforms to the mesh material panel and reveals a surface texture corresponding to the mesh material panel in the skin /mesh/substrate overlap area.

102.     Pursuant to 35 U.S.C. § 287, NIKE notified Puma that it infringes NIKE's '917 patent by offering to sell, selling, and/or importing at least its Netfit footwear products into the United States.  (Ex. AA.)

103.     NIKE asked Puma to stop infringing its '917 patent.  (*Id*.)

104.     Puma declined to "provid[e] further detail into its positions," (Ex. AB) and instead continues to infringe NIKE's '917 patent by making, using, selling, offering to sell, and/or importing its Netfit footwear into this District and elsewhere in the United States without the consent or authorization of NIKE.

105.     On information and belief, Puma promotes and sells its infringing Netfit footwear at retail stores throughout the United States, including at retail stores located in Massachusetts. (Ex. P.)

106.     On information and belief, Puma also promotes and sells its infringing Netfit footwear nationwide, including in Massachusetts, through its website at http://us.puma.com.  (Ex. Q.)

**NIKE Cushioning Technology**

107.     Another one of NIKE's recent footwear innovations relates to cushioning technology.

108.     This cushioning technology relates generally to footwear that includes an upper, a casing or cavity, a plurality of foam beads disposed within the casing or cavity, and an outsole.  In some instances, the technology includes protrusions in the cavity.

26

109.     This cushioning technology offers many benefits.   For example, it provides cushioning for the foot, compressing resiliently under an applied load—such as during walking or running movements—to cushion the foot by attenuating ground-reaction forces.

110.     This cushioning technology is an important component of NIKE's strategy and it is integral to NIKE's success.

111.     NIKE has taken steps to protect its cushioning technology, including by filing and obtaining patents around the world.

112.     Relevant to this dispute, NIKE owns all right, title, and interest in and to U.S. Patent No. 10,098,411 (the "'411 patent").

113.     The U.S. Patent Office duly and legally issued the '411 patent on October 16, 2018. A true and correct copy of the '411 patent is attached as Complaint Exhibit AC.

**Puma Uses NIKE Cushioning Technology without NIKE's Permission**

114.     Puma's Jamming practices the invention claimed in NIKE's '411 patent.   For example, the Jamming is an article of footwear comprising: an upper; a casing comprising: a casing top surface opposing the upper; and a casing bottom surface defining a first divider that extends between a medial side and a lateral side of the article of footwear, the first divider protruding toward the casing top surface and terminating within the casing such that a gap extends between the first divider and the casing top surface; a plurality of foam beads disposed within the casing; and an outsole comprising: an outsole top surface secured to the casing bottom surface and a ground-engaging surface, the outsole top surface and the ground-engaging surface each being contoured upward to define a first groove that extends at least partially between the medial side and the lateral side of the article of footwear and is aligned with the first divider.

27

115.     Puma infringes NIKE's '411 patent by making, using, selling, offering to sell, and/or importing its infringing Jamming footwear in this District and elsewhere in the United States without the consent or authorization of NIKE.

116.     On information and belief, Puma promotes and sells its infringing Jamming footwear at retail stores throughout the United States, including at retail stores located in Massachusetts.  (Ex. P.)

117.     On information and belief, Puma also promotes and sells its infringing Jamming footwear nationwide, including in Massachusetts, through its website at http://us.puma.com.  (Ex. Q.)

### COUNT I
### Patent Infringement under 35 U.S.C. § 271(a) of the '032 Patent

118.     NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

119.     The '032 patent is generally directed to an article of footwear including a textile upper with an exterior constructed from knitted textile material, where the exterior includes a region with stability ribs and a second unribbed region.

120.     On information and belief, Puma directly infringes at least claims 1-4, 8, 13-19, 23, 30-31, and 33-34 of the '032 patent.  For example, Puma's IGNITE Proknit, TSUGI evoKnit Sock, TSUGI Jun CLRSHFT, and TSUGI Jun Cubism satisfy each and every limitation of claim 1 because they are an article of footwear, comprising an upper member substantially constructed from textile material, wherein the upper member includes an exterior portion substantially constructed from knitted textile material, the exterior portion including a first region having stability ribs integrally formed in the knitted textile material and a second region continuous with the first region, the second region not including stability ribs; wherein a first portion of the first

region extends along a forefoot portion of the exterior portion of the upper member and a second portion of the first region extends along a lateral midfoot side of the exterior portion of the upper member; wherein a portion of the second region extends along a junction between the upper member and the sole member and between the first portion of the first region and the second portion of the first region on a lateral midfoot side of the exterior portion of the upper member; and a sole member engaged with the upper member.

121.    On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or importing the IGNITE Proknit would directly infringe the '032 patent; yet Puma infringed and continues to infringe the '032 patent.

122.    As a result of Puma's direct infringement of the '032 patent, NIKE has suffered irreparable harm and damages.

123.    NIKE has no adequate remedy at law for Puma's infringements of the '032 patent.

124.    On information and belief, Puma's infringements of the '032 patent will continue unless enjoined by this Court.

## COUNT II
## Patent Infringement under 35 U.S.C. § 271(g) of the '749 Patent

125.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

126.    The '749 patent is generally directed to a method of manufacturing an article of footwear with a textile element, where the textile element has a first area and a second area, each with a different stitch configuration, that impart varying textures to a surface of the textile element.

127.    On information and belief, Puma directly infringes at least claims 1, 5-6, 8, and 11 of the '749 patent.  For example, at least Puma's IGNITE Proknit, IGNITE Speed Netfit, Mostro

Bubble Knit, Jamming, TSUGI evoKnit Sock, TSUGI Jun CLRSHFT, TSUGI Jun Cubism, TSUGI Shinsei evoKnit, Ferrari Evo Cat, Blaze Cage evoKNIT, Avid evoKNIT, and Limitless Hi evoKNIT satisfy each and every limitation of claim 1 because, on information and belief, Puma manufactures those shoes by simultaneously knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure; removing the knitted textile element from the surrounding knitted textile structure; and incorporating the knitted textile element into the article of footwear.

128.    On information and belief, additional Puma knitted footwear products also potentially infringe at least claims 1, 5-6, 8, and 11 of the '749 patent.

129.    On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that importing, offering to sell, selling, and/or using at least the Puma's IGNITE Proknit, IGNITE Speed Netfit, Mostro Bubble Knit, and Jamming would directly infringe the '749 patent, yet Puma infringed and continues to infringe the '749 patent.

130.    As a result of Puma's direct infringement of the '749 patent, NIKE has suffered irreparable harm and damages.

131.    NIKE has no adequate remedy at law for Puma's infringements of the '749 patent.

132.    On information and belief, Puma's infringements of the '749 patent will continue unless enjoined by this Court.

## COUNT III
## Patent Infringement under 35 U.S.C. § 271(a) of the '488 Patent

133.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

134.     The '488 patent is generally directed to an article of footwear including an upper that incorporates one or more lenticular knit structures formed with different yarns, which generate a visual effect that changes the color of the article of footwear depending on the viewing angle.

135.     On information and belief, Puma directly infringes at least claims 1-5, 10, and 16-17 of the '488 patent.  For example, Puma's IGNITE Speed Netfit, TSUGI Shinsei evoKnit, and Ferrari Evo Cat satisfy each and every limitation of claim 1 because they are an article of footwear including an upper and a sole structure attached to the upper, the upper incorporating a knitted component formed of unitary knit construction, the knitted component comprising: at least one lenticular knit structure including a first portion and a second portion disposed on opposite sides of the lenticular knit structure; and a base portion disposed adjacent to the at least one lenticular knit structure; wherein the at least one lenticular knit structure extends away from the base portion on an exterior surface of the upper; and wherein the first portion of the at least one lenticular knit structure is associated with a first visual effect when the upper is viewed from a first viewing angle and the second portion of the at least one lenticular knit structure is associated with a second visual effect when the upper is viewed from a second viewing angle that is different than the first viewing angle.

136.     On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or importing the IGNITE Speed Netfit would directly infringe the '488 patent, yet Puma infringed and continues to infringe the '488 patent.

137.     As a result of Puma's direct infringement of the '488 patent, NIKE has suffered irreparable harm and damages.

138.     NIKE has no adequate remedy at law for Puma's infringements of the '488 patent.

139.    On information and belief, Puma's infringements of the '488 patent will continue unless enjoined by this Court.

## COUNT IV
## Patent Infringement under 35 U.S.C. § 271(a) of the '046 Patent

140.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

141.    The '046 patent is generally directed to articles, including footwear, with a knitted component that includes multiple tubular rib structures and multiple webbed areas.

142.    On information and belief, Puma directly infringes at least claims 1-2, 17-18, and 20 of the '046 patent.  For example, Puma's IGNITE Speed Netfit satisfies each and every limitation of claim 1 because it is an article comprising: a plurality of webbed areas that include a plurality of courses formed from a first yarn, the webbed areas having a front surface, the webbed areas configured to move between a neutral position and an extended position, the webbed areas being biased to move toward the neutral position, and a plurality of tubular structures that are adjacent to the webbed areas, the tubular structures including a plurality of courses; wherein at least one of the webbed areas or tubular structures is configured to stretch to move the webbed areas to the extended position in response to a force applied to the article, wherein in the neutral position, a first area of the front surface is hidden from visual observation from a first viewing perspective, and wherein in the extended position, the first area of the front surface is revealed for visual observation from the first viewing perspective.

143.    On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or importing the IGNITE Speed Netfit would directly infringe the '046 patent, yet Puma infringed and continues to infringe the '046 patent.

144.    As a result of Puma's direct infringement of the '046 patent, NIKE has suffered irreparable harm and damages.

145.    NIKE has no adequate remedy at law for Puma's infringements of the '046 patent.

146.    On information and belief, Puma's infringements of the '046 patent will continue unless enjoined by this Court.

**COUNT V**
**Patent Infringement under 35 U.S.C. § 271(a) of the '420 Patent**

147.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

148.    The '420 patent is generally directed to an article of footwear including a fluid filled bladder with a reinforcing structure.

149.    On information and belief, Puma directly infringes at least claims 14-20 of the '420 patent.  For example, Puma's Jamming footwear satisfies each and every limitation of claim 14 because it is an article of footwear comprising: a sole structure incorporating a fluid-filled bladder and a reinforcing structure secured to the bladder, the sole structure having an upper Surface and an opposite lower surface, the upper surface forming a ridge that defines a first portion of a lasting surface, at least a portion of the ridge being an inclined surface formed by the reinforcing structure and located over the bladder, the bladder defining a second portion of the lasting surface; and an upper secured directly to the first portion of the lasting surface and the second portion of the lasting surface.

150.    On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or importing the Jamming would directly infringe the '420 patent, yet Puma infringed and continues to infringe the '420 patent.

33

151.     As a result of Puma's direct infringement of the '420 patent, NIKE has suffered irreparable harm and damages.

152.     NIKE has no adequate remedy at law for Puma's infringements of the '420 patent.

153.     On information and belief, Puma's infringements of the '420 patent will continue unless enjoined by this Court.

### COUNT VI
### Patent Infringement under 35 U.S.C. § 271(a) of the '746 Patent

154.     NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

155.     The '746 patent is generally directed to an article of footwear including an upper and a cleat assembly having support bars and stiffened sections.

156.     On information and belief, Puma directly infringes at least claims 1, 5, and 6 of the '746 patent.  For example, Puma's evoSpeed SL footwear and ONE 18.1 Syn FG footwear satisfy each and every limitation of claim 1 because they are each an article of footwear, comprising: an upper; and a cleat assembly coupled to the upper, the cleat assembly including: a base having medial and lateral sides, a plurality of downwardly extending ground engaging members, a medial support bar located on the medial side, a lateral support bar located on the lateral side, a lateral stiffened section located in a region of the cleat assembly generally corresponding to a midfoot portion of the lateral support bar, and a medial stiffened section located in a region of the cleat assembly generally corresponding to a midfoot portion of the medial support bar, the medial stiffened section being stiffer than the lateral stiffened section.

157.     On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or

importing its evoSpeed SL footwear and ONE 18.1 Syn FG footwear would directly infringe the '746 patent, yet Puma infringed and continues to infringe the '746 patent.

158.    As a result of Puma's direct infringement of the '746 patent, NIKE has suffered irreparable harm and damages.

159.    NIKE has no adequate remedy at law for Puma's infringements of the '746 patent.

160.    On information and belief, Puma's infringements of the '746 patent will continue unless enjoined by this Court.

**COUNT VII**
**Patent Infringement under 35 U.S.C. § 271(a) of the '065 Patent**

161.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

162.    The '065 patent is generally directed to an article of footwear with a base plate having a structure and studs.

163.    On information and belief, Puma directly infringes at least claim 1 of the '065 patent.  For example, Puma's FUTURE Netfit FG/AG footwear satisfies each and every limitation of claim 1 because it is an article of footwear comprising: a base plate including a forefoot region, a heel region, a midfoot portion disposed between the forefoot region and the heel region, a longitudinal axis extending through the forefoot region and heel region, a forward edge, a rearward edge, a medial edge, and a lateral edge; a structure disposed on the base plate, the structure including a medial forefoot pad disposed on the forefoot region proximate the midfoot portion and the medial edge, a lateral forefoot pad disposed on the forefoot region proximate the midfoot portion and the lateral edge, a medial heel pad disposed on the heel region proximate the medial edge, a first lateral heel pad disposed on the heel region proximate the lateral edge, a first diagonal rib extending from the medial forefoot pad to the first lateral heel pad, a second diagonal rib

extending from the lateral forefoot pad to the medial heel pad, a medial midfoot bar substantially parallel to the longitudinal axis and disposed proximate the medial edge, and a lateral midfoot bar substantially parallel to the longitudinal axis and disposed proximate the lateral edge; a medial forefoot stud disposed on the medial forefoot pad; a medial heel stud disposed on the medial heel pad; a first lateral forefoot stud disposed on the lateral forefoot pad; and a first lateral heel stud disposed on the first lateral heel pad; the first diagonal rib having a first lateral edge intersecting with the first lateral heel pad; the second diagonal rib having a second lateral edge intersecting with the first lateral forefoot pad; the lateral midfoot bar having a third lateral edge; wherein the medial midfoot bar extends from a first point on the first diagonal rib to a second point on the second diagonal rib; and wherein the third lateral edge of the lateral midfoot bar intersects with, and terminates at, a third point on the second diagonal rib at a forward end of the lateral midfoot bar; wherein the third lateral edge of the lateral midfoot bar intersects with, and terminates at, a fourth point on the first diagonal rib at a rearward end of the lateral midfoot bar; wherein the third point is spaced from the lateral forefoot pad; and wherein the fourth point is spaced from the first lateral heel pad.

164.     On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or importing its FUTURE Netfit FG/AG footwear would directly infringe the '065 patent, yet Puma infringed and continues to infringe the '065 patent.

165.     As a result of Puma's direct infringement of the '065 patent, NIKE has suffered irreparable harm and damages.

166.     NIKE has no adequate remedy at law for Puma's infringements of the '065 patent.

167.    On information and belief, Puma's infringements of the '065 patent will continue unless enjoined by this Court.

## COUNT VIII
### Patent Infringement under 35 U.S.C. § 271(a) of the '679 Patent

168.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

169.    The '679 patent is generally directed to an article of footwear including an upper that incorporates one or more lenticular knit structures formed with different yarns, which generate a visual effect that changes the color of the article of footwear depending on the viewing angle.

170.    On information and belief, Puma directly infringes at least claim 1 of the '679 patent.  For example, Puma's IGNITE Speed Netfit, TSUGI Shinsei evoKnit, and Ferrari Evo Cat satisfy each and every limitation of claim 1 because they include a lenticular knit structure for providing color-shifting properties to a knitted component, the lenticular knit structure comprising: a portion disposed on a first side of the lenticular knit structure; a second portion disposed on a second side of the lenticular knit structure, the second side being disposed opposite the first side; and wherein the first portion of the lenticular knit structure is associated with a first visual effect when the lenticular knit structure is viewed form a first viewing angle and the second portion of the lenticular knit structure is associated with a second visual effect when the lenticular knit structure is viewed from a second viewing angle that is different from the first viewing angle; wherein the knitted component includes a front side and an opposite-facing back side; and wherein the lenticular knit structure is disposed on the front side of the knitted component.

171.    On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or

importing the IGNITE Speed Netfit would directly infringe the '679 patent, yet Puma infringed

and continues to infringe the '679 patent.

172.    As a result of Puma's direct infringement of the '679 patent, NIKE has suffered

irreparable harm and damages.

173.    NIKE has no adequate remedy at law for Puma's infringements of the '679 patent.

174.    On information and belief, Puma's infringement of the '679 patent will continue

unless enjoined by this Court.

### COUNT IX
### Patent Infringement under 35 U.S.C. § 271(a) of the '917 Patent

175.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

176.    The '917 patent is generally directed to an upper of an article of footwear including

a plurality of panels assembled as a composite panel, the composite panel includes a substrate

material panel, a mesh material panel, and a skin material panel.

177.    On information and belief, Puma directly infringes at least claim 1 of the '917

patent.  For example, Puma's Netfit footwear each independently satisfy each and every limitation

of claim 1 because each includes an upper comprising a plurality of panels assembled as a

composite panel, wherein the composite panel includes a substrate material panel; a mesh material

panel, and a skin material panel with at least a portion of the skin material panel overlapping both

the substrate material panel and the mesh material panel in a skin/mesh/substrate overlap area;

wherein the skin material panel is bonded with the mesh material panel and the substrate material

panel throughout the skin/mesh/substrate overlap area, the mesh material panel being captured

between the skin material panel and the substrate material panel; wherein at a portion of the

composite panel outside the skin/mesh/substrate overlap area, the mesh material panel is not

captured between the skin material panel and the substrate material panel; and wherein the skin material panel conforms to the mesh material panel and reveals a surface texture corresponding to the mesh material panel in the skin /mesh/substrate overlap area.

178.    On information and belief, Puma's infringement has been willful, intentional, and deliberate.  Puma knew or should have known that making, using, offering to sell, selling, and/or importing the Netfit footwear into the United States would directly infringe the '917 patent, yet Puma infringed and continues to infringe the '917 patent.

179.    As a result of Puma's direct infringement of the '917 patent, NIKE has suffered irreparable harm and damages.

180.    NIKE has no adequate remedy at law for Puma's infringements of the '917 patent.

181.    On information and belief, Puma's infringement of the '917 patent will continue unless enjoined by this Court.

### COUNT X
### Patent Infringement under 35 U.S.C. § 271(a) of the '411 Patent

182.    NIKE incorporates by reference the allegations in Paragraphs 1 through 117 above.

183.    The '411 patent is generally directed to an article of footwear including an upper, a casing, a plurality of foam beads disposed within the casing, and an outsole.

184.    On information and belief, Puma directly infringes at least claims 1-3, 6-7, and 9-14 of the '411 patent.  For example, Puma's Jamming satisfies each and every limitation of claim 1 because it is an article of footwear comprising an upper; a casing comprising: a casing top surface opposing the upper; and a casing bottom surface defining a first divider that extends between a medial side and a lateral side of the article of footwear, the first divider protruding toward the casing top surface and terminating within the casing such that a gap extends between the first

divider and the casing top surface; a plurality of foam beads disposed within the casing; and an outsole comprising: an outsole top surface secured to the casing bottom surface and a ground-engaging surface, the outsole top surface and the ground-engaging surface each being contoured upward to define a first groove that extends at least partially between the medial side and the lateral side of the article of footwear and is aligned with the first divider.

185.  On information and belief, Puma's infringement has been willful, intentional, and deliberate, at least as of the filing date of this amended complaint.  Puma knew or should have known that continuing to make, use, offer to sell, sell, and/or import the Jamming into the United States would directly infringe the '411 patent, yet Puma infringed and continues to infringe the '411 patent.

186.  As a result of Puma's direct infringement of the '411 patent, NIKE has suffered irreparable harm and damages.

187.  NIKE has no adequate remedy at law for Puma's infringements of the '411 patent.

188.  On information and belief, Puma's infringement of the '411 patent will continue unless enjoined by this Court.

## JURY DEMAND

189.  Pursuant to Federal Rule of Civil Procedure 38(b), NIKE hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, NIKE respectfully prays for:

A.  Judgment that Puma has infringed U.S. Patent Nos. 6,973,746; 7,401,420; 7,637,032; 8,266,749; 9,078,488; 9,314,065; 9,375,046; 10,051,917; 10,070,679; 10,098,411 and

any others NIKE adds to this lawsuit (collectively, the "NIKE Patents") by making, using, offering

to sell, selling, and/or importing its infringing shoes into the United States;

B.      A permanent injunction enjoining Puma and its affiliates, officers, agents,

employees, attorneys, and all other persons acting in concert with Puma, from infringing the NIKE

Patents;

C.      An award of damages adequate to compensate NIKE for Puma's infringements of

the NIKE Patents that have occurred, together with prejudgment and post-judgment interest and

costs;

D.      An award of enhanced damages pursuant to 35 U.S.C. § 284 for Puma's willful

infringement of the NIKE Patents;

E.      A declaration that this case is exceptional under 35 U.S.C. § 285, and that NIKE be

awarded reasonable attorneys' fees and costs;

F.      Such other and further relief as this Court deems just and proper.


Dated: February 19, 2019                        Respectfully submitted,

                                                /s/ Kevin Dam
                                                John P. Iwanicki (BBO# 556465)
                                                Banner & Witcoff, Ltd.
                                                28 State Street, Suite 1800
                                                Boston, Massachusetts 02109
                                                Telephone: (617) 720-9600
                                                Facsimile: (617) 720-9601
                                                JIwanicki@bannerwitcoff.com

                                                Christopher J. Renk
                                                Michael J. Harris
                                                Aaron P. Bowling
                                                Kimberly S. Devine
                                                Kevin Dam
                                                Novaira T. Paul
                                                Banner & Witcoff, Ltd.

71 South Wacker Drive, Suite 3600
Chicago, Illinois 60606
Telephone: (312) 463-5000
Facsimile: (312) 463-5001
CRenk@bannerwitcoff.com
MHarris@bannerwitcoff.com
ABowling@bannerwitcoff.com
KDevine@bannerwitcoff.com
KDam@bannerwitcoff.com
NPaul@bannerwitcoff.com

***Attorneys for Plaintiff NIKE, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/   *Kevin Dam*
Kevin Dam